IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| Lamont McKoy, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.: 5:16-hc-2262 |
| | ) | |
| Frank Lee Perry, *et al*., | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM IN SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS
28 U.S.C. § 2254**

Petitioner Lamont McKoy ("McKoy"), through counsel, submits this memorandum in support of his petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus requiring the Respondents to release him from confinement or retry him within a reasonable time, or in the alternative, ordering an evidentiary hearing and oral argument at which the parties may present compelled testimony and evidence.

Because this is an extraordinary case – one involving actual innocence – McKoy respectfully requests that the Court examine all of the newly developed and discovered evidence in light of the limited, incredible testimony presented against McKoy at trial.

## I.    SUMMARY OF THE NATURE OF THE CASE

 On January 25, 1990, Myron Hailey ("Hailey") was shot as he drove his blue Honda Accord car. Hailey's body was found the following day, slouched in the driver's seat of his car, which had come to rest among some trees in a roadway embankment near Murchison Street in Fayetteville, North Carolina. In 1991, the State tried and convicted McKoy of first degree murder in connection with Hailey's death.

At trial, the State did not introduce any physical evidence—not even a murder weapon—linking McKoy to the shooting death of Hailey.  Instead, the State rested its case almost entirely on the internally inconsistent and uncorroborated testimony of one "eyewitness," Bobby Lee Williams, Jr. ("Williams") (who was then on parole for armed robbery and manslaughter), and the improper testimony of one

Fayetteville police detective. The State's theory at trial, presented through Williams, was that McKoy shot at Hailey from the corner of Bryan Street and Branson Street in the Haymont Hill section of Fayetteville on the evening of January 25, 1990. According to Williams, an earlier shooting that had occurred that same evening in Haymont Hill caused a power outage to the area, and the shooting of Hailey took place after the power had been restored, which occurred around 11:00 p.m.

The evidence available today shows that Williams's account of Hailey's shooting could not have occurred. In particular, McKoy's defense team has uncovered newly-discovered evidence that proves that members of the Special Response Unit of the Fayetteville Police Department ("FPD") were stationed on the *very corner* of Bryan and Branson Streets in Haymont Hill at precisely the *same time* when Williams allegedly witnessed McKoy shoot Hailey's Honda Accord. The defense team further confirmed that the police officers from the Special Response Unit on the scene did not hear any gunshots or witness any shooting – thus directly refuting Williams's testimony. The State was aware of the earlier shooting and the power outage, and even presented testimony that Fayetteville's city dispatcher was aware of the earlier shooting and power outage. Yet the State never disclosed any evidence or information that the Special Response Unit was at the exact same crime scene at the exact same time that the State alleged Hailey was shot. Not only did the State fail to disclose this obvious *Brady* and *Giglio* material, but it also continues to hinder McKoy's efforts to uncover the truth of the circumstances of that evening.

Since McKoy's 1991 conviction, McKoy's defense team has also confirmed that a joint federal, state, and local drug task force ("Task Force") developed substantial credible evidence that William Talley, an enforcer for the "Court Boys" drug gang in Fayetteville, shot Hailey. The evidence shows that Talley, who was known to carry and use a .357 caliber revolver (the same type of weapon used to shoot Hailey), shot Hailey as he drove his blue Honda Accord away from the Grove View Terrace, a housing complex located just down the street from where Hailey's body and car were found on January 26, 1990.

Multiple witnesses from the Task Force investigation recall specific details of the shooting in Grove View Terrace by Talley and the exact location where Hailey's car was later found – *i.e.,* down the grassy embankment off Rowan Street and Murchison Road. Three former Court Boys members were

even aware that a man from Haymont Hill had been wrongly convicted for the shooting, and witnesses were familiar with Hailey and his blue Honda Accord from prior drug sales in Grove View Terrace.

No reasonable juror would have convicted McKoy if the newly-discovered evidence regarding the FPD Special Response Unit and the evidence from the Task Force investigation had been introduced at McKoy's trial. The newly discovered *Brady* and *Giglio* material could have been used to flatly refute Williams's inconsistent and incredible testimony about the circumstances of Hailey's shooting, and McKoy could have introduced the testimony of at least *six* witnesses from the Task Force investigation to counter the sole account provided by Williams.

## II.      PROCEDURAL BACKGROUND

In the spring of 1991, McKoy was convicted of first degree murder in Cumberland County, North Carolina Superior Court and sentenced to life in prison. McKoy then began a lengthy process by which he not only appealed his conviction but also subsequently sought relief under North Carolina law. Some of his requests for relief included constitutional claims relating to *Brady* and *Giglio*, and others related to new evidence developed through the Task Force. McKoy has properly pursued these claims through the procedural structure in place pursuant to North Carolina law, and he has exhausted all possible remedies.

Despite McKoy's efforts, no court has properly examined the factual details of McKoy's *Brady* and *Giglio* claims in the context of the minimal evidence introduced against McKoy at trial. These claims have never been considered and decided on the merits, but instead were summarily dismissed by the North Carolina Superior Court, which purported to rely on procedural grounds under North Carolina law. Further details of the procedural steps taken by McKoy are contained in the accompanying Form AO-241 (Petition for Relief From a Conviction or Sentence By a Person in State Custody).

## III.     FACTUAL BACKGROUND

### A.      Uncontested Facts Relating to McKoy's Conviction at Trial

The following uncontested facts were established by testimony and evidence presented by the State at McKoy's trial, or are recorded in the State's record of its investigation relating to Hailey's death.

### 1. Location and Condition of Hailey's Car

Myron Hailey was found by two witnesses, dead in his four-door blue Honda Accord, sometime after 7:00 a.m. on January 26, 1990. (Fayetteville Police Department, Running Incident Report for Myron Hailey Murder Investigation, Narratives 1-5 (dictated from field notes) [hereinafter "FPD Running Report"], attached as Exhibit 2[1]; McKoy Trial Tr. (testimony of Durwood C. Cannon ("Cannon")) at 9:17-10:3, 11:3-17; *id.* (testimony of Detective Michael J. Ballard ("Ballard")) at 290:8-15.) Hailey's car was found "in the tree-line . . . beside the roadway," by "the section of Rowan Street just as you come over the overpass going toward Bragg Boulevard." The car was "on the right-hand side of the road going toward Fort Bragg," and could only be seen "if you were going off Rowan Street to go on Murchison Road," *i.e.*, "on the down route" from the Rowan Street overpass. (McKoy Trial Tr. (Cannon) at 9:23-10:21.) This trial testimony locates Hailey's car in an embankment found on the north side of Rowan Street, between the Rowan Street overpass (crossing Hillsboro Street) and Murchison Road. (*See* Aerial Image of Area Surrounding Location Where Hailey's Car Was Found [hereinafter "Location of Hailey's Car"], attached as Exhibit 3, for a map illustrating the undisputed location of Hailey's car.)

### 2. Hailey's Body and Cause of Death

When Hailey's body was found, he was slouched over in the driver's seat of his Honda Accord, with his seatbelt on. He was wearing a white sweatshirt, blue jeans, and tennis shoes. (McKoy Trial Tr. (Cannon) at 9:23-18:23, 28:17-26.)

The State determined that Hailey bled to death as a result of a gunshot wound. (McKoy Trial Tr. (Jerald Wolford) at 38:19-22.) The wound was caused by a .357 caliber bullet that had initially entered the rear of the Honda Accord and then ultimately passed through Hailey's body as he sat in the driver's seat. (*Id.* at 13:22-14:5.) The .357 caliber bullet that was recovered from Hailey's car had been fired from a .357 revolver made by one of the following gun manufacturers: Smith & Wesson, Ruger, or

---

[1]     The FPD Running Report appears to be the typed log of the Hailey murder investigation contemporaneously maintained by the FPD officers and investigators.

Taurus.  (McKoy Trial Tr. (Special Agent Thomas Trochum) at 284:19-286:11.)  The State also concluded that Hailey was not shot at the crime scene off Rowan Street, and that the actual shooting had taken place somewhere else.  (FPD Running Report, Exhibit 2, Narrative 2.)

### B. At Trial, the State Did Not Present Any Physical Evidence Linking McKoy to the Shooting of Hailey

The State's case-in-chief included only four witnesses: (1) Durwood C. Cannon, the crime scene technician, who testified to the technical aspects of the investigation but not to where the shooting occurred or who shot Hailey; (2) Jerald Wolford, the pathologist, who testified to the cause of Hailey's death (bleeding  to death from a gunshot wound) but not to where the shooting occurred or who shot Hailey; (3) Bobby Lee "Strawberry" Williams, Jr., who claimed to have witnessed the shooting; and (4) Detective Michael Ballard, who recounted (and attempted to untangle) Williams's testimony and improperly and falsely bolstered Williams's earlier statements.

The State alleged that Hailey was shot on January 25, 1990, in the Haymont Hill section of Fayetteville.  (*See, e.g.*, McKoy Trial Tr. (Williams) 45:4-53:24; Path of Hailey's Car – State's Case vs. Talley Investigation Evidence [hereinafter "Path of Hailey's Car"], attached as Exhibit 4.)  The State presented no physical evidence at trial linking the Haymont Hill area to Hailey's car, Hailey's body, or the gun that caused Hailey's death.  Nor did the State present any physical evidence tying McKoy to the shooting.  The bullets recovered from Hailey's Honda were never matched to any gun or ammunition possessed or used by McKoy, and the State never even established that McKoy owned or used a .357 revolver.[2]  No gun was presented as evidence at trial.

Likewise, no explanation was given as to why Hailey, in fleeing from the purported shooting in Haymont Hill while mortally wounded, would have driven directly past a hospital while making one of a

---

[2]     In fact, McKoy's co-defendant, Charmaine Evans (who was never called to testify or further prosecuted), informed the police investigating Hailey's murder that McKoy did not have a .357 revolver, and instead said that he only knew McKoy to have a black .22.  (John Britt Interview of Charmaine Evans (Mar. 23, 1990) [hereinafter "Britt Interview of Evans"] at 9-10, attached as Exhibit 5.) Additionally, McKoy's wife, Lisa Carette, testified that McKoy only "owned a .22."  (McKoy Trial Tr. (Lisa Carette) at 245:2-8.)

series of turns in his vehicle on the circuitous route that connects Haymont Hill to the embankment located on the north (westbound) side of Rowan Street.  (*See* Path of Hailey's Car, Exhibit 4.)

1. **Without Any Physical Evidence Implicating McKoy, the State Relied On the Uncorroborated, Inconsistent, and Impossible Account of Bobby Lee Williams**

At trial, Williams, the State's "star" witness – a convicted felon who was then on parole – claimed that he saw McKoy shoot at the back of Hailey's car as Hailey drove away from the Haymont Hill area of Fayetteville.  (McKoy Trial Tr. (Williams) 50:25-53:5; Path of Hailey's Car, Exhibit 4.)

According to his testimony, Williams saw Hailey on the night of January 25, 1990, on Branson Street in Haymont Hill, and Hailey explained that someone had provided Hailey with fake drugs in a drug deal.  Williams agreed to help Hailey find that person to make sure that Hailey received either the drugs or his money back.  (McKoy Trial Tr. (Williams) 47:5-17.)

Williams further testified that he and Hailey then walked to the arcade on Branson Street (which was located at the "end of Branson/Turnpike as it comes into a little V") to find the person who sold Hailey the fake drugs.  (*Id.* (Williams) 47:19-21; *id.* (Ballard) 135:17-20.)  Williams said that when he and Hailey went inside the arcade, there were people playing pool.  (*Id.* (Williams) 47:21-24, 69:19-70:13; *see also* Statement of Bobby Lee Williams, taken by FPD Investigators Ballard and Parker (Feb. 20, 1990) [hereinafter "Williams's Feb. 20, 1990 Statement"], attached as Exhibit 6.)  Hailey purportedly did not recognize any of the patrons in the arcade, and he and Williams began to walk back in the other direction on Branson, towards Bryan Street. (McKoy Trial Tr. (Williams) 47:22-25, 70:2-15.)

According to Williams, on their walk back from the arcade, Hailey saw McKoy at the intersection of Bryan Street and Branson Street, and identified him as the person from the drug transaction.  (*Id.* at 47:25-48:15, 71:1-12.)  Williams then allegedly approached McKoy and told him to give Hailey the real drugs or his money back.  (*Id.* at 49:5-22.)  The three men then went behind a house on Bryan Street, where McKoy allegedly provided Hailey with real drugs.  (*Id.* at 49:23-50:24, 75:15-76:12.)

Williams testified that, after the drug transaction, he left McKoy and Hailey and walked over to meet his fiancée Willie Mae McCrowie on the corner of Branson Street and Highland Avenue.  (*Id.* at

6

57:4-12.) Williams said that he then heard a shot coming back from the intersection of Bryan and Branson Streets, and he "walked fast" for "about five minutes" to get back to that intersection. (*Id.* at 50:24-51:2, 57:8-19, 84:13-86:21.) From the corner of Bryan and Branson Streets, Williams claimed to see McKoy running through a path towards Davis Street with either "Cat and Charles Williams (phonetic spelling)" or with "Charmain, and Cat, and Ant Lee."[3] (*Id.* at 51:8-52:3, 57:19-23, 86:22-87:9.) Williams further claimed that he then began to run behind them, and that when he reached the corner of Davis Street and Arsenal Avenue, he saw McKoy shooting at Hailey's car as the car traveled down towards Hay Street and then turned to the right. (*Id.* at 52:4-53:24, 87:19-95:6; Path of Hailey's Car, Exhibit 4.)

2.   **A Critical Aspect of Williams's Testimony Concerned the Timing of the Alleged Shooting by McKoy**

It was uncontested at trial that a separate shooting occurred in Haymont Hill earlier in the evening on January 25, 1990, near the corner of Branson Street and Bryan Street. In fact, witnesses testified that the street lights and a transformer at the corner of Branson and Bryan were shot out, causing a power outage in that area. (*Id.* (Judy Meshaw ("Meshaw")) 268:16-269:16; *id.* (Lisa Carette) 242:23-243:6.) The State even introduced testimony from the Fayetteville Public Works Department that Fayetteville's city dispatcher notified the Public Works Department that the shooting of a transformer and streetlight in the area had caused a power outage. (*Id.* (Meshaw) 269:6-16.)

In light of the fact that a prior, uncontested shooting occurred in the same area and on the same evening as Williams accounted for Hailey's shooting, McKoy's attorney presented evidence suggesting that the prior shooting, which was attributed to Dennis Fort, caused Hailey's death. (*Id.* (Leslie Finley) 191:11-196:25.) In its rebuttal case, however, the State recalled Williams to testify, unequivocally, that he first saw Hailey that evening after the lights went back on, sometime after 11:00 p.m. (*Id.* (Williams)

---

[3]      Three co-defendants were initially charged along with McKoy in connection with Hailey's death: Anthony Lee Everett (also known as "Ant Lee"), James Mitchell (also known as "Cat"), and Charmaine Odette Evans. (Felony Investigative Report, Agency File No. 90-8451 (submitted by M. J. Ballard), attached as Exhibit 7). The State dismissed all of the charges against Everette, Mitchell, and Evans, and none testified at McKoy's trial.

266:1-11.)  The State also elicited rebuttal testimony from other witnesses to establish that the power was restored to Bryan and Branson Streets at around 11:15-11:30 p.m. that night.  (*Id.* (Meshaw) 269:6-16.)

Thus, the timing of when Williams first saw Hailey on the evening of January 25, 1990 was critical to the government's proof, and detrimental to McKoy's defense.

### 3.      Williams Offered Patently False Testimony at Trial

#### a.      Williams's Trial Testimony Was Inconsistent, and Contrary to the Investigation Record and Other Facts

Williams's testimony was incredible and inconsistent when compared to Williams's own statements and other credible evidence gathered by the State during the investigation and presented at trial.  For example, Williams's testimony that he and Hailey visited the arcade to find the person who sold Hailey fake drugs ***after*** the power was restored is flatly contradicted by the fact that (1) the arcade was closed by 9:30 p.m.[4]; (2) the power was restored to the area after at least 11:00 p.m. that evening[5]; and (3) Hailey was approximately 50 minutes away from Haymont Hill as of 8:55 p.m. and, as a result, could not have been in Haymont Hill by 9:30 p.m.[6]  Therefore, it is impossible that Williams and Hailey first met and went into the arcade ***after*** the power was restored to Haymont Hill.  (*Id.* (Williams) at 266:1-11.)

Williams's trial testimony also was internally inconsistent and contradicted a number of his prior statements to police.  For example, in his February 20, 1990 statement, Williams asserted that he first saw Hailey "***standing*** outside his car" at the corner of Bryan and Branson Streets.  (Williams's Feb. 20, 1990 Statement at 1, Exhibit 6.)  On direct examination at trial, Williams's story changed such that he allegedly

---

[4]      Detective Ballard's typed narratives make clear that the arcade owner told Detective Ballard that the arcade was closed at 9:30 p.m. (*see* FPD Running Report, Narrative 16, Exhibit 2) – which would require Williams's account of visiting the arcade with Hailey to have occurred ***before 9:30 p.m***.

[5]      As Williams and others acknowledged at trial, power was not restored in the area that night until at least ***11:00 p.m***.  (*Id.*; *see also id.* (Meshaw) at 269:6-16 ("[P]ower was restored between 11:15 and 11:30 p.m.").)

[6]      During its rebuttal case, the State presented evidence that Hailey was present at a store known as D.A. Kelly's in Clinton, North Carolina at 8:55 p.m. that evening.  (McKoy Trial Tr. (Sandra Adams) 271:16-272:20.)  Clinton is at least a 35-mile drive from Haymont Hill, and the drive between the two locations takes approximately 50 minutes.  (Directions from D.A. Kelly's, Clinton, NC, to Branson Street and Bryan Street, Fayetteville, NC, Google Maps (printed Feb. 19, 2013), attached as Exhibit 8.)

first saw Hailey "***walking*** . . . on Branson [Street]" or "between . . . Highland [Avenue] and Branson [Street]", and, on cross-examination, he further asserted Hailey "wasn't standing on no corner. He wasn't standing on no street. He was walking." (McKoy Trial Tr. (Williams) 45:21 to 46:6, 66:6-15.)

Williams also initially told the police that he and McCrowie ran down a path after McKoy and two other men after Williams heard a shot fired near Branson and Bryan Streets.[7] At trial, Williams changed his story and admitted that McCrowie did not run down the path with him.[8] (Williams's Mar. 19, 1990 Statement, attached as Exhibit 10; *see also* McKoy Trial Tr. (Williams) 51:21-52:8.)

Williams's testimony was also incredible and inconsistent on details relating to (1) Hailey's clothing,[9] (2) the weather on the night of the shooting,[10] (3) the location of Hailey's car when Williams first observed it,[11] and (4) the direction that Hailey's car travelled after it had been shot.[12]

---

[7]    *See* Williams's Feb. 20, 1990 Statement, Exhibit 6; Investigation Notes of Detective Michael J. Ballard, Myron Hailey Murder Investigation, at 76 (Bates-stamp page numbers added by Duke Clinic) [hereinafter "Ballard's Notes"], attached as Exhibit 9.

[8]    Williams revised the earlier statement after Detective Ballard obtained a statement from McCrowie, in which she denied being on the path with Williams. (Statement of Willie Mae McCrowie, taken by Fayetteville Police Department Investigator Ballard (Feb. 22, 1990), attached as Exhibit 11.) Williams apparently falsely told Detective Ballard that McCrowie was present because Detective Ballard was "having a hard time understanding where I was talking about, so I used Willie Mae as a reference to [Detective Ballard] . . . ." (Williams's Mar. 19, 1990 Statement, Exhibit 10.)

The typed running police report and Detective Ballard's hand-written notes also contain a discrepancy on this point: The hand-written notes indicate that Williams said McCrowie was with him when he followed the men through the path, but the typed running police narrative, which was created from the hand-written notes, omits that notation and otherwise makes no mention of McCrowie's name. (*Compare* FPD Running Report, Narrative 65, Exhibit 2, *with* Ballard's Notes 75-76, Exhibit 9.)

[9]    Williams testified that Hailey was wearing a grey, polyester, short-sleeved shirt. (McKoy Trial Tr. (Williams) 66:16-26.) In fact, according to both a photograph and the reports of law enforcement personnel, Hailey was wearing a long-sleeved white sweatshirt. (McKoy Trial Tr. (Cannon) 188:17-22; see also FPD Running Report, Narrative 14, Exhibit 2.)

[10]    Williams testified that the night of the murder was clear and "milk warm." (McKoy Trial Tr. (Williams) 96:16-26.) But, the State's witness Crime Scene Technician Cannon testified it rained very hard that night, and even caused Hailey's car to become bogged down in the wet sand when it was towed away. (McKoy Trial Tr. (Cannon) 189:9-16, 190:6-7; *see also* FPD Running Report, Narrative 11 (responding officers' notation that it rained), Exhibit 2.)

[11]    In his February 20, 1990 statement, Williams claimed to have seen Hailey's car when he first saw Hailey standing at the corner of Bryan and Branson Streets. (Williams's Feb. 20, 1990 Statement at 1, Exhibit 6.) On cross-examination at trial, however, Williams instead testified that he did ***not*** see Hailey's (cont'd)

### b. Williams Admitted his Testimony Was False

Williams's trial testimony was false. In fact, Williams has since admitted to providing false testimony at the trial. Williams's former fiancée, McCrowie, has provided a sworn affidavit that, after McKoy's conviction, Williams told her that he had lied to the police, that he did not see McKoy shoot Hailey, and that Williams intended to inform the police. (Affidavit of Willie Mae McCrowie ¶¶ 15-19 (Apr. 3, 2004) [hereinafter "McCrowie Aff."], attached as Exhibit 12.) Sadly, in 2000, Williams was murdered in prison before he could officially recant his testimony.

In light of Ms. McCrowie's affidavit, the numerous inconsistencies in Williams's testimony clearly support the conclusion that Williams gave false testimony. (*Id.*)

### c. Williams's Testimony Defies the Laws of Physics

Williams's testimony also defies common sense and physics. For example, for his testimony to have been true, he, McKoy and the others allegedly with him would have had to be running faster than 30 miles an hour. Williams consistently asserted that after the first shot was fired, McKoy and two other men chased after Hailey on foot, as Hailey fled the scene by driving down Bryan Street. Williams, McKoy and the others apparently ran so fast that they arrived at the corner of Davis Street and Arsenal Avenue at the same time as Hailey's car. (McKoy Trial Tr. (Williams) 51:3-25, 52:1-15, 86:22-26, 87:1-92:12; Williams's Feb. 20, 1990 Statement, Exhibit 6.)

Simple physics dictates, however, that Williams's story could not be true. The road distance from the corner of Branson and Bryan Streets to the corner of Arsenal Avenue and Davis Street is 868 feet. Driving this route at an unhurried speed of 35 mph would take a car 17 seconds. In contrast, the path to

---

car when he first saw Hailey (McKoy Trial Tr. (Williams) 70:25-26), and later claimed he first saw the car after encountering McKoy and going behind the house. (*Id.* at 77:17-23.) On redirect, Williams then claimed to have first seen the car on Bryan Street. (*Id.* at 119:21-24.)

[12] In his February 20, 1990 statement, Williams said that, after he allegedly observed McKoy fire at Hailey's car, "I don't know which way he went after that." (Williams's Feb. 20, 1990 Statement at 4, Exhibit 6.) In his trial testimony, however, Williams said repeatedly that he saw Hailey's car turn to the right from Davis Street onto Hay Street. (*See, e.g.*, McKoy Trial Tr. (Williams) 52:24-53:1, 53:21-24, 59:23-60:2, 93:23-25, 95:4-6.)

Davis Street as described by Williams at trial covers a distance of approximately 781 feet. Running this path in 17 seconds would require a foot speed of 31.4 mph. The fastest world class sprinters, on a straight, flat, level running track, can run at only 23 mph. (Graphical Analysis of Williams's Description of Events (created by Engineer Phil Locke for the Duke Clinic), attached as Exhibit 13.)

Williams's testimony that it took him about five minutes, "walk[ing] fast," to travel from the corner of Branson Street and Highland Avenue (where he claimed to have first heard a shot) to the corner of Branson and Bryan Streets (to where he claimed McKoy and the others ran) is similarly implausible. (McKoy Trial Tr. (Williams) 84:10-85:2; 86:9-25.) The distance along Branson Street from the corner of Highland Avenue to the corner of Bryan Street is approximately 348 feet. (*See* Path of Hailey's Car, Exhibit 4.) Walking that distance over the course of five minutes would result in a walking pace of less than 1 mile per hour. Studies of pedestrian walking speeds show that the average walking speed of male pedestrians under 60 is 3.38 miles per hour. (Karen Aspelin, *Establishing Pedestrian Walking Speeds*, Institute of Transportation Engineers (May 31, 2009), *available at* http://www.westernite.org/datacollectionfund/2005/psu_ped_summary.pdf, attached as Exhibit 14.)

4. **Detective Ballard Offered No Original Testimony Regarding the Night of Hailey's Shooting and Provided Only Gratuitous, Unsupported Statements to Corroborate Williams**

Detective Ballard had no firsthand personal knowledge of the shooting, and his trial testimony regarding the night's events did nothing more than restate Williams's account. (McKoy Trial Tr. (Ballard) 154:8-11.) Most notably, Detective Ballard repeated Williams's assertion that Williams and Hailey went into the arcade at the intersection of Branson Street and Turnpike Road (McKoy Trial Tr. (Ballard) 132:14-18, 135:17-20), despite the fact that Detective Ballard knew that the arcade closed at 9:30 p.m. (FPD Running Report, Narrative 16, Exhibit 2 (interview of Mary Ann Quinn).)

Detective Ballard also repeated Williams's testimony that "five minutes" passed between the gunshot on Bryan and Branson and the point when Williams was "walking real fast" to arrive at Bryan via

Highland (McKoy Trial Tr. (Ballard) 163:6-14) – even though that account would mean both that

Hailey's car travelled implausibly slowly and that Williams walked extraordinarily slowly as well.[13]

The State also improperly used the testimony of Detective Ballard to bolster Williams's

testimony by suggesting that Williams's recollection of events was consistent with the statements of other

purported witnesses – none of whom were ever called to testify at trial. (McKoy Trial Tr. (Ballard)

168:1-6.) Those references were also misleading because the purported "witnesses" referenced by

Detective Ballard would not have adopted the statements that the detective had attributed to them.[14]

### C. The Newly Discovered Evidence Regarding the FPD Special Response Unit and the Talley Investigation

#### 1. Newly Discovered Evidence Regarding the FPD Special Response Unit Conclusively Proves that McKoy Did Not Shoot Hailey

Williams's critical testimony that he met Hailey after 11:00 p.m. (after the power was restored to

Haymont Hill) has now been rendered impossible in light of new evidence, known to the State at the time

of trial. Specifically, McKoy's defense team has determined that officers from an FPD Special Response

---

[13] In a weak attempt to introduce "admissions" made by McKoy during the investigation of Hailey's homicide, the State also presented testimony from Detective Ballard describing a March 9, 1990 conversation between Detective Ballard and McKoy. The brief conversation, however, consisted of McKoy denying any knowledge of Hailey's murder and McKoy responding to each of Detective Ballard's assertions about things the detective claimed to know by saying, "I know it." (McKoy Trial Tr. (Ballard) 140:19-141:8.) It is hard to imagine that anyone would conclude McKoy made any admissions during his brief encounter with Detective Ballard – which began and concluded with McKoy indicating to Detective Ballard that he did not want to talk to him. (FPD Running Report, Narratives 108-109, Exhibit 2.) In fact, the night before McKoy's arrest – days after Detective Ballard obtained the purported "admissions" from McKoy – Detective Ballard acknowledged that "*the evidence at this point is minimal*." (*Id.* at Narrative 111.)

[14] For example, Detective Ballard wrote out a statement on behalf of Charmaine Evans saying that McKoy shot at a car – the color of which Evans could not identify. (Statement of Charmaine Odette Evans, taken by FPD Investigator Ballard, at 2 (Mar. 20, 1990) [hereinafter "Evans Statement"], included in Exhibit 5.) Evans almost immediately told his lawyer that his statement written by Detective Ballard was false, and that he had been fed details of the incident while being interrogated and threatened with jail time. (Britt Interview of Evans at 10-11, Exhibit 14.) Evans has since recanted any statement made about McKoy and admitted that he gave a false statement in order to get out of jail. Evans has also stated that, prior to McKoy's trial, he was asked by ADA John Dickson to testify against McKoy, and that Evans told ADA Dickson that McKoy did not kill anyone. (Notarized Letter from Charmaine Evans to Graham Gurnee (May 23, 2002), attached as Exhibit 15; Notarized Letter from Charmaine Evans to Graham Gurnee (Oct. 21, 2004), attached as Exhibit 16.) Evans never testified at McKoy's trial.

Unit were investigating the early shooting that took place in the Haymont Hill area, and that those officers were **on site at the very same street corner** and at the **very same time** that Williams claims Hailey was shot. The FPD Special Response Unit officers, however, reported no other shooting that evening.

According to an FPD Incident Card, which McKoy's defense team obtained from state prosecutors, a call was received at 9:43 p.m. on January 25, 1990, regarding "shots fired into [an] occupied dwelling," at the location of Branson and Bryan Streets. (Fayetteville Police Department Incident Card No. 8340 (Jan. 25-26, 1990) [hereinafter "FPD Incident Card"], attached as Exhibit 17.) The FPD Incident Card states that an FPD unit was dispatched at 9:49 p.m. (*Id.*)

Sergeant Tracy Campbell, one of the FPD officers dispatched to the scene, was present at the very location specified by Williams at the same time Williams testified Hailey was shot. Sergeant Campbell remembered responding to Haymont Hill after the transformer was shot out, and recalled being on location for several hours that night and into the early morning hours of the next day.[15] (Affidavit of Glenn Mobley (July 23, 2013) [hereinafter "Mobley Aff."] at ¶ 8(c), attached as Exhibit 18.) If shots were fired at that intersection of Haymont Hill that night, Sergeant Campbell's unit would have heard them – and they would have seen the shooting.[16] (*Id.* at ¶ 8(d).)

If information about the Special Response Unit's presence at Haymont Hill was made available to McKoy at trial, it would have completely undermined Williams's entire account of the purported shooting. The fact that FPD officers were on the scene at the same time that Williams claimed that Hailey had been shot would have rendered Williams's story impossible.[17]

---

[15]    Sergeant Campbell's unit regularly worked from 5 p.m. until 1 a.m., which could be extended during a response to gang activity. (Mobley Aff., Exhibit 18, ¶¶ 8(a)-(b).) If Sergeant Campbell's unit responded to an area, it would remain until the area was secured and report writing was completed. (*Id.*)

[16]    This earlier shooting on Haymont Hill also was not, and could not have been, where or when Hailey was shot the night of January 25, 1990. As discussed above, Williams testified that the events he allegedly observed regarding Hailey occurred only after power was returned to Haymont Hill – *i.e.*, following the shooting that blew out the transformer on Branson and Bryan Streets.

[17]    The State continues even today to hinder McKoy's defense team's efforts to obtain additional evidence from Sergeant Campbell to further develop these crucial facts. Although McKoy's defense team (cont'd)

2. **The Joint Task Force Investigation and the Talley Trial Developed Evidence That Talley, Not McKoy, Shot Hailey**

Two years after McKoy's 1991 conviction, the U.S. Attorney's Office in Raleigh formed the Task Force, comprised of federal, state, and local law enforcement personnel, to mount an extensive investigation into Cumberland County's gang-related activity.[18] The Task Force concentrated on the Court Boys, a gang known for using violent tactics to control the drug trade in Fayetteville's Grove View Terrace housing project. (Marc Barnes, 5 Arrested In Court Boys Drug Probe, Fayetteville Observer (Aug. 18, 1995) [hereinafter "5 Arrested Article"], attached as Exhibit 21.)

a. **The Talley Evidence Would Have Refuted Williams's Testimony**

If McKoy had been aware of the evidence developed during the investigation of William Talley, a Court Boys enforcer, during McKoy's trial,[19] he would have been able to call upon *__six__* former members of the Court Boys gang to testify that the shooting that took Hailey's life occurred in Grove View Terrace, not Haymont Hill. More importantly, five of those Court Boys witnesses would have been able to name Talley as Hailey's shooter.

For example, Bernard McIntyre, a former Court Boy member, would have been able to testify that in January 1990, he was familiar with Hailey and his light blue Honda Accord because Hailey regularly bought drugs from McIntyre. (Affidavit of Bernard McIntyre (July 11, 2007) [hereinafter

was able to conduct an initial interview of Sergeant Campbell, the State subsequently denied McKoy's defense team any further access to Sergeant Campbell or evidence related to the night of January 25, 1990 in Haymont Hill. Most recently, the State has informed Sergeant Campbell that they cannot prevent him from speaking with McKoy's defense team, but they have explicitly cautioned Campbell against it, and these cautions have been effective. (*See* Affidavit of Glenn Mobley (September 16, 2016), attached as Exhibit 19.)

[18] The Task Force was made up of members of the FPD, the Cumberland County Sheriff's Department, the State Bureau of Investigation ("SBI"), the Federal Bureau of Alcohol, Tobacco, and Firearms ("BATF"), and the Secret Service. (Marc Barnes, Task Force Ingredients Help Win Drug Battles, Fayetteville Observer (Oct. 15, 1995) [hereinafter "Task Force Ingredients Article"], attached as Exhibit 20.)

[19] Unfortunately, this extensive, corroborated evidence from the Talley investigation had not yet been developed at the time of McKoy's trial in 1991, and was even largely unavailable to McKoy's post-conviction counsel ten years later at the time of his September 13, 2001 First MAR Hearing. (Affidavit of Graham Gurnee (May 22, 2014) [hereinafter "Gurnee Aff."] at ¶¶ 4-11, attached as Exhibit 22.)

"McIntyre Aff."], attached as Exhibit 26.)  McIntyre would have been able to further testify that he saw

Talley offer to sell drugs to Hailey, that Hailey snatched the drugs and drove off without paying, and that

he saw Talley shoot Hailey's car several times.  (*Id.*)

James Rodney Smith, another former Court Boy member, would have been able to testify that he

witnessed a shooting of a "blue Honda"[20] in Grove View Terrace, in which an occupant of the Honda

snatched drugs from a Grove View Terrace dealer, and shots were fired at the car that "couldn't have

missed."  (Affidavit of Jarvis John Edgerton IV (Apr. 2, 2013) [hereinafter "Edgerton Aff."] at ¶¶ 9-13,

attached as Exhibit 27.)  Smith also would have testified that when he later left Grove View Terrace to go

to "Vic's Club" (just over the bridge on Rowan Street, near Murchison Road), he saw the taillights of the

Honda down an embankment.  (*Id.* at ¶ 14; *cf.* Location of Hailey's Car, Exhibit 3.)

Former Court Boys members Ronald Perkins and Kelly Debnam would have been able to testify

(as they did at Talley's trial) that they witnessed Talley fire his handgun at the back of a vehicle fleeing

Grove View Terrace after something went wrong during a drug deal, and that the vehicle appeared to

have been hit.  (Talley Trial Tr. vol. I, 133:24-25; 134:1-8, 17-25; 135:1-19 (Bates Stamp 282-84, Perkins

testimony); 224:8-25; 225:1-25 (Bates Stamp 373-74, Debnam testimony), attached as Exhibit 23.)

Those two witnesses also would have been able to explain to the McKoy jury that they saw the car drive

out of Grove View Terrace, and noticed that the car had run off of the side of the road and came to rest on

the "grassy part" of the bridge embankment near Murchison Road.[21]  (*Id.* at 135:3-6 (Bates Stamp 282-84,

Perkins testimony) and 225:7-15 (Bates Stamp 373-74, Debnam testimony), Exhibit 23; *cf.* Location of

Hailey's Car, Exhibit 3.)

---

[20]     Unlike James Rodney Smith and Bernard McIntyre, who were able to accurately describe Hailey's vehicle as a "blue Honda" or "light blue Honda Accord," Williams never testified that he knew the color or make of Hailey's car.  These accurate identifications of Hailey's car from the Talley investigation further indicate that Talley, not McKoy, shot at Hailey's car.

[21]     Anthony Perkins, another former Court Boy and brother of Ronald Perkins, would have been able to offer similar testimony.  (Post-Trial Interview Summary, SBI Agent S. E. Fox interviewing Ronald Perkins and Anthony Perkins (July 10, 1995), SBI Case 1994-04077 (692-M-4-4) (memo dated July 28, 1995) (interview conducted after Talley's conviction) [hereinafter "Perkins Interview"], attached as Exhibit 24.)

15

Another Court Boy witness, Craig Roberts, would have been able to testify that he saw Talley fire six shots at a car in Grove View Terrace, heard a scream from the driver that made him think the driver had been shot, and that the car drove off slowly. (*United States v. Wilson et al.*, No. 3 :94-CR-65-5-Bo, Interview Summary, SBI Agent Fox interviewing Craig Everette Roberts, SBI Case 1994-04077 (692-M-4-4) (June 6, 1995) (memo dated July 7, 1995) [hereinafter "Roberts Interview"], at 1, attached as Exhibit 25.) Roberts also could have testified that another Court Boy, who was present at the scene, told Talley "you hit him," to which Talley responded: "I know. . . shouldn't have taken my shit." (*Id.* at 2.)

In total, five former Court Boys members would have been able to provide specific testimony or statements confirming that the car Talley shot ended up in an embankment off Rowan Street and Murchison Road, west of the Rowan Street overpass – the ***same undisputed location*** where Hailey's car was found. (*Cf.* McKoy Trial Tr. (Cannon) 9:23-10:21 ("The only way you could really see it is if you were going off Rowan Street to go onto Murchinson Road and on the down route you could see it parked from that location."); *see also* Location of Hailey's Car, Exhibit 3.) In sworn testimony at the Talley trial, in statements to Task Force investigators, and in statements to McKoy's counsel, made over the course of twelve years, these five witnesses consistently identified the resting location of the car that was shot in the Grove View Terrace. (Talley Trial Tr., vol. I, 135:2-12 (Bates Stamp 284), Exhibit 23; Perkins Interview at 2, Exhibit 24; Talley Trial Tr. vol. I, 225:7–15 (Bates Stamp 374), Exhibit 23; Roberts Interview at 2, Exhibit 25; Edgerton Aff., ¶ 14, Exhibit 27.)

It is no coincidence that the location described by the Court Boys members is the ***exact location*** where Hailey's car was found, in accordance with the State's evidence at McKoy's trial: Hailey was the ***only person*** found in a car in that location during the relevant time period. (Email from Lt. Christopher Davis, Fayetteville Police Department, to Jarvis John Edgerton, Duke Clinic (Aug. 2, 2010 and earlier correspondence) (regarding May 1988-February 1991 FPD homicides), attached as Exhibit 28; Spreadsheet of FPD Homicide Cases (created by Duke Clinic, July 26, 2011), attached as Exhibit 29.)

16

Thus, when the Court Boys members reported seeing the car at the precise spot that Hailey's car was found, they could have been referring only to Hailey and his blue Honda.

Notably, a number of the Court Boys members were specifically aware of McKoy's wrongful conviction for the shooting that they witnessed Talley commit – further indicating that Talley was the person who shot Hailey. (*See, e.g.*, Roberts Interview at 1, Exhibit 25 ("Roberts advised that he remembered the murder for which a **black male subject from Haymont Hills** had been convicted and sentenced to life in prison."); Perkins Interview at 2, Exhibit 25 ("Perkins later found out the driver of the car had been killed and that **someone from Haymont Hill** had been arrested.").) In fact, Ronald Perkins told Task Force investigators that "it was **common knowledge** among the people who lived on Haymont Hill that William Corrie Talley had shot at the vehicle the same night that the victim was killed." (Perkins Interview at 2, Exhibit 24.)

The testimony and statements of the Court Boys members that the shooting occurred in Grove View Terrace support a much more credible account for how Hailey's car arrived at the location where it was found, further discrediting Williams's version of events. After turning right out of Grove View Terrace (per testimony at Talley's trial), Hailey's car would have simply turned once to go west on a single road – Grove Street, which turns into Rowan Street – and then veered off the road into the embankment by Murchison Road where his car was found. (*See* Path of Hailey's Car, Exhibit 4.) Turning west onto Grove Street also was consistent with Hailey driving toward the nearby hospital. (*See id.*) In contrast, Williams's recollection of the shooting would have required Hailey to drive on at least four different streets in a circuitous route, and would have required Hailey to drive past and away from a hospital that could have provided him with medical attention. (*See id.*)[22]

_____

[22] To the extent that McKoy would have been allowed to bolster the testimony of the Court Boys members (as the State did with Williams through Detective Ballard's testimony), McKoy would also have been able to rely on multiple Task Force agents to introduce such testimony. (*United States v. Wilson et al.*, No. 3:94-CR-65-5-BO, SBI Special Agent Fox's Memo to SBI Special Agent McKinney (May 16, 1995) [hereinafter "Agent Fox's Memo"], attached as Exhibit 30 ("[E]vidence has been developed which indicates that Talley was involved in the murder of Myron Craig Hailey."); *United States v. Wilson et al.*, (cont'd)

Case 5:16-hc-02262-FL   Document 2   Filed 10/31/16   Page 17 of 31

### b. The Credibility and Volume of Evidence from the Talley Investigation Exposes the Lack of Evidence in the McKoy Trial

In contrast to the complete lack of any physical evidence presented at McKoy's trial to tie McKoy to Hailey's shooting, the evidence developed during the Talley investigation would have also linked a .357 revolver – the actual caliber and type of gun used to shoot Hailey (McKoy Trial Tr. (Trochum) 284:19-286:11) – to the actual shooter, Talley.  Crucially, Talley was known to have fired a .357 caliber Ruger revolver within Fayetteville city limits just *15 days* before Hailey was shot in his car.  (*United States v. Wilson et al.*, No. 3:94-CR-65-5-BO, Presentence Investigation Report (E.D.N.C. June 20, 1995) [hereinafter "Talley Presentence Report," referencing Bates-stamp numbers] at 633 ¶ 10, 636-37 ¶ 37, attached as Exhibit 32.)  Multiple Court Boys members also would have been able to testify that Talley regularly carried a .357 caliber revolver. (*See, e.g.*, Talley Trial Tr. vol. I, 192:16-22 (Bates Stamp 341), Exhibit 23 (testimony of Court Boys member Steve Evans that Talley carried a revolver or a 9 mm handgun); *United States v. Wilson et al.*, No. 3:94-CR-65-5-BO, Interview Summary, Investigators K.C. Eaker and R.J. Clinkscales interviewing James Rodney Smith (Dec. 20, 1994), SBI Case 1994-04077 (692-M-4-4) (memo dated June 1, 1995) [hereinafter "Smith Interview"], attached as Exhibit 33) (statement of Court Boys member James Rodney Smith that Talley "always carried a gun, usually a 9mm handgun or a .357 caliber revolver").)  And, at the time of his arrest in October 1993, Talley was found in possession of a Smith & Wesson .357 revolver.  (*United States v. Wilson et al.*, No. 3:94-CR-65-5-BO, Trial Transcript vol. II, 91:11-15 (Bates Stamp 481) [hereinafter "Talley Trial Tr. vol. II"], attached as Exhibit 34; Talley Presentence Report at 633 ¶ 12, Exhibit 32.)

---

No. 3:94 CR 65 5 BO, Sentencing Hearing Transcript 8:24-10:7 (Aug. 10, 1995) [hereinafter "Talley Sentencing Hearing Tr."], attached as Exhibit 31 (stating that Special Agent Fox, a Task Force agent, believed based on his investigation that Talley was "the only shooter" and that Talley "fired six to seven rounds from a large handgun" and that the car drove off slowly – and confirmed that "[t]he person was found dead in the car . . . [f]rom a bullet wound.").)

## IV.  FEDERAL HABEAS REVIEW IS PROPER AND ESSENTIAL IN THIS CASE TO AVOID A MISCARRIAGE OF JUSTICE

### A.  Jurisdiction and Standard of Review

A federal district court can entertain an application of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court, on the ground that he is in custody in violation of the Constitution of the United States.  28 U.S.C. § 2254(a).  As set forth in this brief, McKoy's conviction by the state of North Carolina is in violation of at least the Fourteenth Amendment of the U.S. Constitution, as construed by well-established U.S. Supreme Court law in *Brady*, *Giglio*, and *Napue*.

A federal district court may hear an application for a writ of habeas corpus when the applicant has exhausted the remedies available in the courts of the state.  28 U.S.C. § 2254(b)(1)(A).  McKoy clearly exhausted his state remedies for the constitutional claims raised in this petition – all of which were raised to the North Carolina Superior Court in connection with McKoy's Second Motion for Appropriate Relief; were rejected by that court in an order that failed to reach the merits on any claim and also barred any further claims in the state; and were denied writ of certiorari to the North Carolina Court of Appeals. McKoy has no further right under the laws of North Carolina to raise the claims he now asserts here.

In a case where the state court did not reach the merits of a constitutional claim raised in a federal habeas petition, the federal habeas review need not provide deference to the state court proceedings, and the claim is reviewed *de novo*.  *See, e.g., Cone v. Bell*, 556 U.S. 449, 472 (2009); *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) ("[W]here a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo.").

Here, in response to McKoy's Second Motion for Appropriate Relief ("Second MAR") in which McKoy first raised the instant *Brady* and *Giglio* claims, the North Carolina Superior Court provided an opinion lacking in substance.  To the extent its opinion can be parsed, however, the court rejected each of the claims asserted here on ***procedural*** grounds under various sections of North Carolina General Statute § 15A-1419(a).  Importantly, no prior court ever considered the merits of the *Brady* and *Giglio* claims raised in this petition and first raised in the Second MAR.  This case thus merits *de novo* review.

**B.**     **Any Procedural Barriers to Federal Habeas**
**Review of McKoy's Constitutional Claims Are**
**Overcome by McKoy's Strong Showing of Actual Innocence**

1.     **Legal Standard**

Federal habeas petitions may be subject to other procedural limitations, including an unexcused procedural default in state proceedings, or running of the 1-year statute of limitations under 28 U.S.C. § 2244(d)(1) (calculated from, among other things, the date that judgment became final by the conclusion of direct review).

In either of these situations, the U.S. Supreme Court has held that a showing of "actual innocence" demonstrates that a miscarriage of justice would occur if the applicant's constitutional claims are not heard by the federal district court, and thus serves as a "gateway" to federal habeas review in such cases. *See Schlup v. Delo,* 115 S. Ct. 851 (1995); *House v. Bell,* 126 S. Ct. 2064 (2006); *McQuiggin v. Perkins,* 133 S. Ct. 1924 (2013) (applying "actual innocence" gateway to overcome the § 2241(d)(1) statute of limitations). The purpose of this exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons." *McQuiggin*, 133 S. Ct. at 1931.

The standard for showing "actual innocence" is that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 126 S.Ct at 2076-77. Such a showing "raises sufficient doubt about the petitioner's guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error." *Id*. at 2077. While the claim requires some "new reliable evidence . . . that was not presented at trial, . . . the habeas court is not limited to that evidence." *Id.*

Accordingly, the federal habeas court making an actual innocence inquiry should consider all the evidence, "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." *Id*.; *see also Teleguz v. Zook*, 806 F.3d 803, 808 (4th Cir. 2015) (court analyzing actual innocence gateway should consider whether the "totality of evidence would prevent any reasonable juror from finding him guilty beyond a reasonable

doubt"). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact on reasonable jurors." *Id*.

> 2. **With New Evidence of McKoy's Innocence and Other Evidence Known Today, No Reasonable Juror Would Find McKoy Guilty Beyond a Reasonable Doubt**

As explained above, there is substantial new reliable evidence not presented by or known to McKoy at the time of his trial, as well as corroborating evidence in McKoy's trial record, demonstrating that no reasonable juror would have found him guilty beyond a reasonable doubt in view of what is known today. Among other things, we now know that (1) the State's account of the crime was impossible, (2) the testimony of the only alleged eyewitness to testify at trial was fabricated, and (3) the crime for which McKoy was convicted was committed by another man in another location of Fayetteville, in accordance with the statements and testimony of numerous witnesses and other evidence.

> a. **Evidence of FPD Special Response Unit at Haymont Hill Shows That Hailey Could Not Have Been Shot by McKoy at the Time and Place Alleged by the State**

McKoy could not have shot Hailey at the time and place alleged by the State, because new reliable and undisputed evidence shows that an FPD Special Response Unit was on scene (*i.e.*, at the *same place* and *same time* as the account of events for which McKoy was convicted), and yet not a single officer heard or saw any gunshots after they were called to the scene at Haymont Hill that night. (Mobley Aff. ¶¶ 8(a)-(d), (g), Exhibit 18; FPD Incident Card, Exhibit 17.)

The presence of the FPD Special Unit renders the testimony of Williams, the State's sole alleged eyewitness, wholly unbelievable. The shots could not have been fired on Branson Street and Bryan Street on the night of January 25, 1990 without the knowledge of the FPD Special Unit that was at that location all night and into the early hours of the next day.

Knowing about the FPD Special Unit's presence at Haymont Hill, no reasonable juror could find beyond a reasonable doubt that McKoy was guilty of shooting and killing Hailey. The State's account of the crime – that it took place on the night of January 25, 1990, starting at Bryan Street and Branson Street, after the earlier shooting – is simply impossible.

### b.  Strong, Corroborated Evidence Shows That Hailey
###      was Murdered by Talley at a Different Location

Only a single alleged eyewitness, Williams, was presented at McKoy's trial for Hailey's murder.

In contrast, substantial, corroborated evidence from the Court Boys gang trial and investigation indicates that Hailey was fatally shot by Talley in Grove View Terrace, not by McKoy in Haymont Hill. The evidence developed in the Court Boys investigation lines up with the known facts of Hailey's death:

- At least one Court Boys member identified Hailey by name as Talley's shooting victim, provided a motive for Talley to murder Hailey, stated that he was familiar with Hailey and his blue Honda Accord from prior drug sales in Grove View Terrace, and stated that he saw Talley shoot at Hailey's blue Honda Accord several times as it drove away.[23]

- Three Court Boys members stated that they were aware a man from Haymont Hill (*i.e.*, McKoy) had been convicted for the shooting done by Talley.

- Six Court Boys members saw Talley shoot at a car, appearing to wound the driver who drove out of Grove View Terrace, five of whom identified Talley by name in trial testimony, sworn statement or statement to law enforcement.  One recalled that Talley admitted hitting the driver.

- Five Court Boys said that they saw the car the next day at the very same location as Hailey's car was found per the testimony of the State's crime technician in McKoy's trial: down an embankment off Rowan Street and Murchison Road, just down off the overpass (*i.e.*, on the westbound side of the road); and, a thorough investigation of FPD homicide files – confirmed in writing by FPD – revealed that there were no other bodies besides Hailey's found at that location during the relevant timeframe.

---

[23]     The information developed during the McKoy investigation by Detective Ballard also suggests that Grove View Terrace was a possible location of Hailey's shooting.  In fact, Hailey's father told Detective Ballard that his son, Myron Hailey, had been known to associate with people in Grove View Terrace; and another associate of Hailey's said that she had been with Hailey to purchase drugs in "the Courts" (*i.e.*, Grove View Terrace).  (FPD Running Report at Narratives 23-24, 39, Exhibit 2.)

- The location more plausibly suggests a car having gone off the road travelling west, *i.e.*, from Grove View Terrace toward Bragg Boulevard and the nearest hospital, rather than east, *i.e.*, from the direction of Haymont Hill and away from the nearest hospital.

- Witnesses identified Talley as regularly using a .357 magnum revolver. The presentencing report for Talley's case also described several instances in which he used a .357 magnum, including one in Fayetteville just **15 days** before Hailey's shooting. Talley was also arrested in 1993 with a loaded .357 magnum revolver in his car. In contrast, no evidence was presented at McKoy's trial that he owned or used a .357 magnum revolver.

- Special Agent S.E. Fox of the North Carolina State Bureau of Investigation ("SBI"), who was very close to the investigation and took many of these witness statements, informed his superiors by memo that the investigation revealed Talley to be Hailey's shooter, not McKoy. (Agent Fox's Memo, Exhibit 30.) He also explained at Talley's sentencing hearing that Talley was the only shooter, even though there was a man convicted in state court for the shooting.[24] (Talley Sentencing Hearing Tr., Exhibit 31, at 8:24-10:7.)

- Even Talley's trial attorney, Alexis Pearce, tried to assist McKoy when he realized that the evidence that came out in Talley's trial and sentencing hearing could indicate that McKoy was wrongfully convicted. (State v. McKoy, No. 90 CRS 11412, Motion for Appropriate Relief Hearing Transcript (Sept. 13, 2001), attached as Exhibit 35, at 6:21-10:13, 14:22-15:12.)

All of this evidence, coming from former associates of Talley with no motive to lie, federal and state law enforcement officials, along with FPD's acknowledgment that Hailey's body was the only one found in a car in the embankment off Murchison Road and the westbound side of Rowan Street in the

---

[24]     Assistant U.S. Attorney John Bennett, who prosecuted Talley, also argued during Talley's sentencing hearing that Talley had committed the shooting, and later explained to the U.S. Court of Appeals for the Fourth Circuit that he did so because "[w]e believed our witnesses." *See U.S. v. Wilson*, 135 F.3d 291, 300 n.6 (4th Cir. 1998).

relevant time, particularly in comparison to Williams's incredible and false testimony, would preclude any reasonable juror from finding McKoy guilty beyond a reasonable doubt for the murder of Hailey.

> **c. Uncorroborated Testimony of Sole Alleged Witness Williams Does Not Withstand Scrutiny in View of New Evidence**

First and foremost, new evidence shows that Williams has ***admitted*** that his testimony was false.

Second, in view of the substantial corroborated evidence implicating Talley as Hailey's only shooter, and the clear evidence ruling out any other shootings on January 25, 1990 around Branson and Bryan Streets after the initial shooting to which the FPD responded, a reasonable juror would discount the inconsistent and impossible trial testimony of Williams, the sole alleged eyewitness implicating McKoy. *See Schlup v. Delo*, 513 U.S. at 868 ("[U]nder the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial.").

It is now clear that Williams told an impossible story, in light of his testimony about visiting an arcade that had already closed and travelling down a path towards Davis Street at a faster-than-humanly-possible pace. The impossibility of Williams' story is further confirmed by the presence of the FPD Special Response Unit ***at the exact same location and time as the alleged crime scene*** and all of the Talley case evidence. No reasonable juror could find McKoy guilty beyond a reasonable doubt. Under *Schlup*, it would be a miscarriage of justice if the court were to decline to reach McKoy's constitutional claims on the merits.

## V. CONSTITUTIONAL VIOLATIONS OF MCKOY'S DUE PROCESS RIGHTS UNDER THE 14TH AMENDMENT MERIT DISMISSING THE CHARGES AGAINST HIM OR GRANTING A NEW TRIAL

### A. Legal Standards

#### 1. *Brady* Violations from Evidence Suppressed by the State

The State has an affirmative obligation to disclose material evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Agurs*, 427 U.S. 97, 107-11 (1976); *State v. Canady*, 355 N.C. 242, 252, 559 S.E.2d 762, 767 (2002); *see also Banks v. Dretke*, 540 U.S. 668, 696

(2004) ("[A] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

Even when the prosecutor does not possess the *Brady* material herself, she has a "duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The three "essential components" of a violation of *Brady* and its progeny are "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 555 (4th Cir. 1999).

Evidence is considered suppressed if it is "information which had been known to the prosecution but unknown to the defense." *Id.* at 557 (quoting *Agurs*, 427 U.S. at 103). Suppression of evidence does not require bad faith of the prosecution. *Brady*, 373 U.S. at 87. Nor does it require that the prosecution itself know of the evidence. *Youngblood v. W. Virginia*, 547 U.S. 867, 869-70 (2006); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964).

"Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" of a different result is shown when the State's suppression of the evidence "undermines confidence in the outcome of the trial." *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678). "The question is not whether the defendant could more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. For example, evidence that goes to impeachment of eyewitness testimony implicating the defendant in a crime is material where the eyewitness testimony was the only evidence linking the defendant to the crime. *See Smith v. Cain*, 132 S. Ct. 627, 629-30 (2012) (finding a *Brady* violation where State withheld handwritten notes of a detective indicating that the sole alleged eyewitness was unable to made an identification).

A single failure of the State to disclose favorable evidence can alone constitute a constitutional violation. *See, e.g.*, *Spicer*, 194 F.3d at 551-53, 556-61; *Norris v.* Slayton, 540 F.3d 1241, 1243-44 (4th Cir. 1976). At the same time, no failure to disclose favorable evidence should be determined non-material – and therefore not a constitutional violation – without considering it in combination with all other failures; the materiality determination in this context "turns on the cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421.

### 2. *Giglio/Napue* Violations from the State's Sponsorship and Failure to Correct False Testimony

Due process requires the prosecutor to correct false testimony given by a witness. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the testimony or merely allowed it to go uncorrected on appeal." *Bagley*, 473 U.S. at 679 n.8. "The district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Napue*, 360 U.S. at 270; *see also People v. Savvides*, 1 N.Y.2d 554, 556-57 (1956) (reasoning that a prosecutor's failure to correct false statements "constitutes error so fundamental, so substantial that a verdict of guilt will not be permitted to stand").

### B. The State Violated McKoy's Constitutional Rights by Failing to Disclose that FPD Was at the Alleged Location of the Murder All Night, but Observed Nothing

### 1. Withholding Information About the FPD's Presence Violates *Brady*

The State knew that members of the FPD's Special Response Unit were present in Haymont Hill at the ***exact same*** time and location that the State alleged Hailey was shot. Law enforcement responded to the call about a shooting at Branson and Bryan Streets, and they remained on the scene while Public Works repaired the transformer and restored the lights. (FPD Incident Card, Exhibit 17.) Law enforcement remained working until the early hours of the next day to secure the area but heard, and saw, no other shootings. (Mobley Aff. ¶ 8(b)-(c), Exhibit 18.)

The presence of the FPD at Haymont Hill is a critical piece of evidence that completely undermines the State's case. The State's ultimate theory was that McKoy shot Hailey after the initial

shooting occurred.  Because the FPD Special Response Unit was on the scene at the same time as the alleged shooting, per the testimony of the State's sole alleged eyewitness, the State's narrative is impossible.  As a result, the State's suppression of this evidence violated *Brady* and *Giglio*.

Had the prosecution fulfilled its *Brady* obligation and disclosed the Unit's presence at Haymont Hill that night, the defense would have been able to invalidate the State's entire narrative and prevent the wrongful conviction of McKoy.  For example, the defense could have interviewed the Special Response Unit members to better evaluate the activity at Haymont Hill that night, and, of course, called some or all of the officers as witnesses at trial in order to counter Williams's testimony about the timing and location of the shooting he claimed to have witnessed.

The effectiveness of this information about the Special Response Unit would not have been confined to undermining Williams's story.  The evidence also "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation . . . ."  *Kyles*, 514 U.S. at 445.

**C.    The State Violated McKoy's Constitutional Rights by Failing to Correct Patently False Testimony of Williams**

Williams, the sole alleged eyewitness, offered testimony that was uncorroborated, internally inconsistent and impossible in view of known facts.  Yet, the prosecution did nothing to correct his egregious, material errors – and in fact sponsored them.

Most notably, for purposes of the State's rebuttal case intending to show that Hailey could not have been shot in connection with the initial shooting on January 25, 1990, the State brought Williams to testify that the initial shooting caused the power to go out and that Williams first saw Hailey after the power returned.  Williams said this was after 11:00 p.m., and the State provided further testimony from the Public Works Commission that it was after 11:15-11:30 p.m.  (McKoy Trial Tr. (Williams) at 266:1-11; *id.* (Meshaw) at 269:6-16.)  Yet, prior to his rebuttal testimony, Williams consistently asserted that Williams and Hailey entered the arcade with people inside playing games *before* they located McKoy. (Williams's Feb. 20, 1990 Statement, Exhibit 6; McKoy Trial Tr. (Williams) 47:19-24.)

The State's investigation, however, revealed that the arcade closed at 9:30 p.m. on the night of the shooting. Just a few hours after Hailey's body was found, Detective Ballard interviewed Mary Ann Quinn, the owner of the arcade. Ms. Quinn said the arcade closed at about 9:30 p.m. (FPD Running Report, Narrative 16 (interview of Mary Ann Quinn), Exhibit 2; Ballard's Notes 2, Exhibit 9.)

Just as it was impossible for McKoy to have shot Hailey at Branson Street and Bryan Street while the FPD Special Response Unit was on site, it was equally impossible for Williams's repeated story involving the arcade to have taken place. Simply stated, Williams could not have first met Hailey after the power returned after 11 p.m. and then walked into the arcade.

Williams's initial story was further impossible in view of other rebuttal testimony offered by the State that Hailey was in Clinton, North Carolina at 8:55 p.m. that night. It is unimaginable that Hailey could have joined Williams at Fayetteville at 9:30 p.m. that night when Clinton is approximately a 50-minute drive from Fayetteville.

Yet, knowing that both of these accounts were impossible, the State allowed Williams to offer them at trial and without correction. The State's failure to correct Williams's false and misleading testimony severely prejudiced McKoy at trial. As Williams was the only witness directly implicating McKoy in the murder, impeaching his credibility by showing the inconsistency of his story would have shed considerable doubt on the sufficiency of the State's evidence. *See, e.g., Smith*, 132 S. Ct. at 629-31 (finding a *Brady* violation where undisclosed notes from the lead investigator revealed that the sole alleged eyewitness previously made statements contradicting his trial testimony).

The State's failure to correct Williams's false testimony thus violates *Brady* and *Giglio*.

### D. The Cumulative Effect of the State's *Brady* and *Giglio* Violations in this Case Renders the Verdict Not Worthy of Confidence

In determining whether the trial resulted in a verdict worthy of confidence, *Brady* evidence should be considered in light of its cumulative effect. *Kyles*, 514 U.S. at 421; *see also Agurs*, 427 U.S. at 112 n. 21 (an undisclosed statement from a confident exculpatory witness is material and grounds for reversal where only two witnesses were presented).

*Brady* and *Giglio* claims are evaluated collectively to determine the cumulative effect of the violations. *See United States v. Kohring*, 637 F.3d 895, 911-12 (9th Cir. 2010); *United States v. Battles*, 2013 WL 718750, at *9 (3d Cir. 2013) (citing *United States v. Pelullo*, 105 F.3d 117, 123-24 (3d Cir. 1997) (stating that the cumulative effect of *Brady* and *Giglio* violations may result in verdict unworthy of confidence)).

Each of the claims above sets out facts and circumstances that independently warrant relief, and the cumulative effect of the State's failures to disclose *Brady* material and correct false testimony is staggering and undeniably undermines confidence in the outcome of the trial. This conclusion is especially true given the utter lack of physical evidence tying McKoy to the crime. *See Monroe v. Angelone*, 323 F.3d 286 (4th Cir. 2003).

Taken together, the evidence suppressed by the state and false statements uncorrected by the State at trial deprived McKoy of the opportunity to establish that (1) McKoy could not have shot Hailey at Haymont Hill, (2) the statements of the State's sole alleged eyewitness, Williams, were a fabrication, and (3) the police did not conduct a proper investigation to find the individual who murdered Hailey.

Altogether, there can be no confidence in McKoy's conviction. McKoy was denied a fair trial within the meaning of *Kyles*, 514 U.S. at 434 as a trial resulting in a verdict worthy of confidence, and is therefore entitled to relief.

## VI.  CONCLUSION

Wherefore, Lamont McKoy respectfully asks this Honorable Court to grant the relief requested in his Petition.

Respectfully submitted, this 31st day of October, 2016.

/s/ Jamie Lau
N.C. Bar No. 39842
Attorney for Lamont McKoy
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, NC 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262
E-mail: jamie.lau@law.duke.edu
Local Civil Rule 83.1 Counsel
Attorney for Petitioner

/s/ Theresa A. Newman
N.C. Bar No. 15865
Attorney for Lamont McKoy
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, NC 27708
Telephone: (919) 613-7133
E-mail: newman@law.duke.edu
Attorney for Petitioner

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the foregoing MEMORANDUM IN

SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS upon the Attorney General of North

Carolina by depositing a copy thereof, postage prepaid, in the United States mail, addressed as follows:

The Honorable Roy Cooper
Attorney General of North Carolina
<u>Attention:  Appellate Section</u>
PO Box 629
Raleigh, NC 27602

This 31st day of October, 2016.

<u>/s/ Jamie Lau</u>
N.C. Bar No. 39842
Attorney for Lamont McKoy
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, NC 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262
E-mail: jamie.lau@law.duke.edu
Local Civil Rule 83.1 Counsel
Attorney for Petitioner